UNITED STATES of America, Appellee,

v.

Ricardo VILLEGAS, Carlos Gomez-Sanchez, Cesar Garcia-Marin, Pedro Jaramaillo, Jaime Cortez, Johana Torrez, John Berrio, Meliton Valbuena, Harold Gomez, Martin Bolivar, Heriberto Torrez, Defendants-Appellants.

Nos. 477, 571, 478, 500, 479, 480, 484, 481 to 483 and 508, Dockets 89–1089, 89–1090 and 89–1092 to 89–1100.

United States Court of Appeals, Second Circuit.

Argued Nov. 27, 1989.

Decided March 27, 1990.

David R. Homer, Asst. U.S. Atty., Albany, N.Y. (Frederick J. Scullin, Jr., U.S. Atty., N.D.N.Y., on the brief), for appellee.

Dennis B. Schlenker, Albany, N.Y. (Feit & Schlenker, Albany, N.Y., on the brief), for defendant-appellant Ricardo Villegas.

Thomas J. Spargo, Albany, N.Y., for defendant-appellant Carlos Gomez–Sanchez.

David A. Lewis, New York City (The Legal Aid Society, Federal Defender Services Appeals Unit, New York City, on the brief), for defendant-appellant Cesar Garcia–Marin.

Matthew J. Kelly, Albany, N.Y. (Roemer & Featherstonhaugh, Albany, N.Y., on the brief), for defendant-appellant Pedro Jaramaillo.

Stephen W. Herrick, Albany, N.Y., for defendant-appellant Jaime Cortez, joined the arguments of defendant-appellant Villegas, et al.

Fernande Rossetti, Albany, N.Y., for defendant-appellant Johana Torrez.

Elena C. Vaida, Albany, N.Y., for defendant-appellant John Berrio.

Gaspar M. Castillo, Jr., Albany, N.Y., for defendant-appellant Meliton Valbuena.

Richard L. Mott, Albany, N.Y., for defendant-appellant Harold Gomez.

Stanley B. Segal, Albany, N.Y. (Segal, Sherrin & Glasel, Albany, N.Y., of counsel), submitted a brief for defendant-appellant Martin Bolivar.

Terence L. Kindlon, Albany, N.Y., submitted a brief for defendant-appellant Heriberto Torrez.

Before KEARSE, ALTIMARI, and MAHONEY, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Ricardo Villegas, Carlos Gomez–Sanchez ("Gomez–Sanchez"), Cesar Garcia–Marin ("Garcia"), Pedro Jaramaillo, Jaime Cortez, Johana Torrez, John Berrio, Meliton Valbuena, Harold Gomez ("Gomez"), Martin Bolivar, and Heriberto Torrez appeal from final judgments entered in the United States District Court for the Northern District of New York, after a jury trial before Con. G. Cholakis, *Judge*, convicting each of them on one count of conspiracy to manufacture and distribute cocaine, in violation of 21 U.S.C. § 846 (1988); and one count of possession of cocaine base with intent to manufacture cocaine, one count of possession of cocaine with intent to distribute, and one count of manufacture of cocaine, all in violation of 21 U.S.C. § 841(a)(1) (1988). Each defendant was sentenced to concurrent terms of imprisonment on each of the four counts as follows: Heriberto Torrez 25 years; Villegas 20 years; Garcia, Johana Torrez, and Bolivar 13 years; and the remaining defendants 10 years.

On appeal, defendants raise numerous claims of error. Villegas, Cortez, and Berrio contend that evidence against them should have been suppressed because it was the product of a search warrant that violated their rights under the Fourth Amendment to the Constitution. Villegas also challenges the district court's ruling that he was competent to stand trial; Berrio challenges the court's preclusion of his defense of duress. Other contentions include arguments by Villegas, Johana Torrez, Berrio, Bolivar, and Heriberto Torrez that the district court erred in denying their motions to sever their trials from the trial of their codefendants, and challenges by Gomez–Sanchez, Jaramaillo, Johana Torrez, Valbuena, and Heriberto Torrez to the sufficiency of the evidence to support their convictions. For the reasons below, we reject all of defendants' contentions and affirm the judgments of conviction.

## I. BACKGROUND

The present prosecution arises out of the investigation of a suspected cocaine manufacturing operation in Herkimer County, in the Northern District of New York. The 11 defendants were arrested on July 14, 1987, at a farm at which massive amounts of cocaine and cocaine manufacturing materials were found.

### A. *The Events Prior to July 14, 1987*

In 1985, Villegas, a Colombian native who had been employed full-time since 1968 as a custodian at a New York City hospital at an annual salary of less than $18,000, went shopping for a farm. In early 1986, in the name of B & V Village Farms, Inc., Villegas bought a 377–acre dairy farm on Johnnycake Road in Herkimer County ("Johnnycake farm"). Villegas paid the $310,000 purchase price in several installments, consisting of cash and checks; there was no mortgage. At one meeting with the sellers, Villegas paid them $11,000 in cash pulled from his parka.

Soon after Villegas took possession of the premises, local residents, including

some hired by Villegas to tend the farm, began noticing a number of unusual occurrences at the farm, including arrivals and departures of rental trucks; arrivals of large numbers of Hispanic men, women, and children, with the men remaining at the farm for three or four weeks; in the garage, large numbers of grey rubber trash barrels ("[m]aybe 75"), though only three were needed at any one time for farming operations; and unusual smells not associated with farming.

During the period April 1985 to May 1987, local agents of the United States Drug Enforcement Administration ("DEA") ferreted out three operating cocaine factories on farm-type properties in the Northern District of New York. These properties had been purchased by natives of Colombia, with title placed in the names of nominal individuals or entities; two were purchased for cash without mortgages, and one was financed with a private mortgage; some of the persons associated with the operations lived or worked in the New York City area; the factory equipment included plastic barrels; the operations involved the importation of workers and materials at irregular times.

In April 1987, a confidential informant advised a DEA agent that there was an operational cocaine factory located approximately 25 minutes from Utica, New York. The informant stated that the factory was being operated by a person named Ricardo, who transported chemicals to the farm in a red Ford van, and whose New York City telephone number was (718) 805–2872. Investigation revealed that that telephone number, which was unlisted, belonged to Villegas; further investigation revealed that Villegas had subscribed to telephone service for the Johnnycake farm, which was less than a 30–minute drive from Utica. Toll records showed, *inter alia*, that calls had been made (1) from Villegas's New York City number to (a) a telephone number used by a person believed to control a cocaine distribution organization, (b) the business number of a person suspected of smuggling cocaine paste into the United States from South America; and (2) from Johnnycake farm to a number used by a suspected purchaser of chemicals used in cocaine factories.

The agents learned of Villegas's purchase of the farm for cash and checks. They attempted to observe the goings-on at the farm by driving past it. On one drive-by, they saw a red vehicle similar to that described by the informant. On another drive-by they saw a stack of plastic garbage cans of the type known to be used in clandestine cocaine factories and a black 55–gallon drum of the type known to contain ether.

On May 12, 1987, the agents applied for a warrant to search the Johnnycake farm premises. The affidavit of Special Agent Ulises R. Delgado, submitted in support of the application, included a recitation of the above information known to the agents. It also stated, *inter alia*, that covert physical surveillance of the premises was difficult by reason of the farm's remote location, that pen register surveillance revealed only infrequent use of the farm telephone, that there was no informant who could infiltrate the operation, and that numerous coconspirators remained to be identified. Accordingly, the Delgado affidavit stated that the agents did not wish to seize the evidence believed to be on the premises; rather, the agents requested authorization to conduct a search, at any time in the day or night, in order "to take photographs but not physically to seize any tangible items of evidence at this time." The agents also requested permission to postpone giving Villegas notice of the search for seven days, or for a longer period if the period were extended by the court.

Judge Cholakis signed the search warrant, as requested, on May 12 ("May 12 warrant"), and it was executed on May 13. The agents entered the premises late at night when no one else was present. They observed that "[t]he place looked like a camp when you close it down for the winter," with few dishes in the kitchen, no clothes in the closets, and no linen on the beds or in any of the drawers. In the basement, the agents observed a stack of 10 to 15 plastic garbage cans, a multi-gallon container containing a greenish sub-

stance, and a large hydraulic press of the type used in other laboratories for compacting finished cocaine for packaging, storage, and transportation. In the garage, were, *inter alia*, 40–50 more plastic garbage cans; a large ceramic pot in which there was a white powdery residue; several empty 55– and 30–gallon drums of a type known to be used for ether and acetone, which are necessary to the manufacture of cocaine; a rack for drying cocaine, consisting of a large plywood board to which 16 light fixtures had been affixed; and another hydraulic press.

The agents seized nothing tangible but took photographs of various parts of the house, the garage, and their contents. The agents did not leave a copy of the May 12 warrant at the house, and thereafter they repeatedly sought extensions, eight in all, to allow them to continue the investigation without alerting the targets. In support of each request, they filed an affidavit reporting on the progress of the investigation and explaining the need for the additional delay. The extensions were granted, authorizing delay of service of notice through July 15.

In the period between May 13 and July 15, the investigation developed additional information. Late in May, Heriberto Torrez, accompanied by several other men, picked up a large shipment of chemicals from Florida, paying for the shipment with $2,710 in cash. The chemicals, after remaining in storage for some weeks, were transported to the Johnnycake farm in late June and early July.

On a 4:00 a.m. drive-by on July 9, agents observed two men carry a garbage can down the driveway and dump its liquid contents, which gave off strong chemical odors. On a 2:30 a.m. drive-by on July 14, the agents smelled ether, an aroma they had encountered in investigations of other clandestine cocaine factories.

On July 14, the agents applied for and obtained another search warrant ("July 14 warrant"), based on, *inter alia*, the affidavit submitted in support of the May 12 warrant, the observations made in the May 13 search, and the information gained thereafter. The July 14 warrant directed that the premises be searched and that any cocaine, cocaine base, and other indicia of the manufacture and processing of cocaine be seized.

### B. *The July 14, 1987 Arrests and Seizures*

On the evening of July 14, 1987, seven DEA agents and approximately one dozen state police officers executed the July 14 warrant, knocking and identifying themselves before entering. In the process of executing the warrant, the agents seized, *inter alia*, large quantities of cocaine in various stages of production and arrested the 11 defendants.

When the officers entered, they found eight of the defendants in the basement and the other three on the first floor. Those in the basement were Gomez–Sanchez, Garcia, Jaramaillo, Cortez, Berrio, Gomez, Bolivar, and Heriberto Torrez. Of this group, Berrio and Cortez were found in a room on the right side of the basement, an area used to leach cocaine base out of the charcoal in which it had been imported into the country. Near Berrio were, *inter alia*, a triple-beam scale and numerous cheesecloth bags full of spent charcoal. Both Berrio and Cortez were covered with charcoal dust.

Gomez–Sanchez, Garcia, Jaramaillo, Gomez, Bolivar, and Heriberto Torrez were found in a room on the left side of the basement, an area used to process the cocaine base into cocaine hydrochloride. Nearby were 17 drums containing cocaine in varying stages of crystallization, a hydraulic press, and glass containers of hydrochloric acid. Like Berrio and Cortez, these six defendants were covered with charcoal dust.

The other three defendants, Villegas, Valbuena, and Johana Torrez, were on the first floor of the house when the agents entered. Villegas, who had just arrived at the house with groceries, was found standing near the kitchen. Johana Torrez was observed standing at a table in the living room. On the table were a sewing machine with a piece of cheesecloth in position to be

stitched, a large roll of cheesecloth, and a number of already sewn cheesecloth packets. Valbuena was found fully clothed in a shower stall in the first floor bathroom; the front of his clothing was covered with charcoal dust.

On the first floor of the house, the agents also seized, *inter alia,* two 30-kilogram barrels of quinine (a common cocaine cutting agent), a .22 caliber rifle, four notebooks with records relating to weights of the charcoal bags and cocaine. In addition, a triple-beam scale was seized from a closet, and approximately two kilograms of packaged cocaine were seized from another closet.

Upstairs, the agents discovered unpressed cocaine drying under heat lamps in the bathroom, fifteen one-pound cloth-wrapped packages of drying cocaine and women's clothing in a bedroom closet, and two microwave ovens and a number of portable fans in the hallway. In all, the agents found more than 24 kilograms of cocaine drying in the upstairs area.

### C. *The Prosecution*

Each of the 11 defendants was indicted on four counts: (1) conspiracy to manufacture and distribute cocaine, (2) possession of cocaine base with intent to manufacture cocaine, (3) possession of cocaine with intent to distribute it, and (4) manufacture of cocaine.

The defendants made a variety of pretrial motions. As discussed in Part II.A. below, Villegas and others moved to suppress the evidence seized from the Johnnycake farm on the ground that the issuance of the May 12 search warrant violated their Fourth Amendment rights. They also contended that their rights were violated by the delay in receiving notice of the May 13 search. The district court ruled that only Villegas had standing to challenge the search and that his challenges had no merit.

In addition, as discussed in Parts II.C., D., and E., respectively, Villegas moved to be declared incompetent to stand trial, several defendants sought to assert as a defense that they had participated in the Johnnycake farm operation under duress, and Villegas, Johana Torrez, Berrio, Bolivar, and Heriberto Torrez moved for severances. The court ruled that only Gomez would be allowed to present a duress defense, and it denied the defendants' other motions.

At trial, the government's evidence consisted largely of testimony of DEA agents as to the background of the search, a description of the arrests, and a description of the evidence seized. Gomez presented his defense of duress. Villegas presented financial evidence designed to show that he could have purchased Johnnycake farm with lawfully earned funds. Jaramaillo testified that he had arrived at the farm on the morning of July 14 and had done nothing more than watch television; he had talked to no one, heard nothing, and seen none of the narcotics-related items the agents found lying in the open on the first floor. Jaramaillo testified that he had run to the basement upon hearing the officers knock and seeing an armed man at the door. He said he had not previously been in the basement.

The jury found each of the defendants guilty on all four counts of the indictment. They were sentenced as indicated above, and these appeals followed.

## II. DISCUSSION

On appeal, defendants make a variety of arguments. They include Villegas's contentions that the May 12 search warrant was unlawful and that he was not competent to stand trial; Berrio's contention that he was improperly denied the opportunity to present a defense of duress; Gomez's contention that he was denied a fair trial because his pretrial interpreter was not competent; Garcia's contention that certain trial testimony as to the nature of Colombian narcotics cartels was so inflammatory as to deny him a fair trial; the contentions of several defendants that their trials should have been severed from the trial of their codefendants; and the contentions of several defendants that the evidence was insufficient to support their convictions.

We have considered all of defendants' contentions and have found them to be without merit.

## A. *The May 12 Search Warrant*

In the district court, Villegas and several other defendants moved to suppress the evidence seized pursuant to the July 14 search warrant on the grounds that the information proffered in support of the application for that warrant was the product of the May 13 search, and that the May 13 search was unlawful because the May 12 warrant pursuant to which it was conducted was unlawful. Defendants contended that the May 12 warrant violated their rights by authorizing a covert entry, without notice, to search but not seize. In an opinion reported at 700 F.Supp. 94 (N.D.N.Y.1988), the district court found that only Villegas had standing to challenge the May 12 warrant and that his challenges were without merit.

On this appeal, these challenges are pursued by Villegas, Berrio, and Cortez. For the reasons below, we conclude that the motions to suppress were properly denied by the district court.

### 1. The Standing of Berrio and Cortez

■ A defendant has no right to have evidence suppressed on Fourth Amendment grounds unless the breached privacy expectation was his own rather than that of a third party. *See, e.g., Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 425–26, 58 L.Ed.2d 387 (1978). The defendant may demonstrate the infringement of his own legitimate expectation of privacy by showing that he owned the premises or that he occupied them and had dominion and control over them by leave of the owner. *See Jones v. United States,* 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960), *overruled on other grounds, United States v. Salvucci,* 448 U.S. 83, 85, 100 S.Ct. 2547, 2549, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois,* 439 U.S. at 140–48, 99 S.Ct. at 428–33. A defendant who, at the time of the search, neither owned nor occupied the premises nor had any dominion or control over them has no standing to contest a search of the premises.

■ Berrio, far from claiming any ownership interest in or control over Johnnycake farm, contended that he was brought to the farm three days before the July 14 arrests and forced to stay there under duress (see Part II.D. below). Berrio made no showing that he was at the farm or even had any knowledge of it prior to July 11. He thus showed no expectation of privacy in the Johnnycake farm premises in May 1987.

■ Cortez fares no better. When the agents entered on May 12, they found no evidence that anyone was then in residence there. There were no clothes in the closets and no linens on the beds or in the drawers. When arrested on July 14, Cortez told the agents he had been at Johnnycake farm for 30 days. Thus there was no basis for finding that Cortez had any privacy expectation in the premises in May 1987.

Accordingly, we agree with the district court's ruling that only Villegas had standing to challenge the May 12 warrant.

### 2. The Lawfulness of the May 12 Warrant

Villegas contends that the May 12 warrant was unlawful under both Fed.R. Crim.P. 41 and the Fourth Amendment principally because it authorized a search without a seizure of tangible property and authorized a covert entry without contemporaneous notice. We reject these contentions.

#### a. *Search Without Seizure*

The Fourth Amendment provides that

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Rule 41 of the Federal Rules of Criminal Procedure provides, in pertinent part, as follows:

**(b) Property ... Which May Be Seized With a Warrant.** A warrant may be issued under this rule to search for and seize any (1) property that constitutes evidence of the commission of a criminal offense; or (2) contraband, the fruits of crime, or things otherwise criminally possessed; or (3) property designed or intended for use or which is or has been used as the means of committing a criminal offense....

. . . .

**(d) Execution and Return with Inventory.** The officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken. The return shall be made promptly and shall be accompanied by a written inventory of any property taken....

. . . .

**(h) Scope and Definition....** The term "property" is used in this rule to include documents, books, papers and any other tangible objects.

Fed.R.Crim.P. 41(b), (d), (h).

In challenging the May 12 warrant on the ground that it authorized a search without a seizure of tangible evidence, Villegas argues that this type of warrant "is unauthorized by Rule 41 and is unconstitutional because it does not comply with the particularity requirements of the Fourth Amendment," contending that "[i]f 'information' regarding the status of a criminal enterprise is an intangible item which can be listed as the subject of a search on a warrant, then the particularity requirement is nullified." (Villegas brief on appeal at 11, 12.) This contention is contrary to established doctrine.

■ First, we note that Rule 41 does not define the extent of the court's power to issue a search warrant. Obviously the Fourth Amendment long antedated the Federal Rules of Criminal Procedure, which were first adopted in 1944. Given the Fourth Amendment's warrant requirements, and assuming no statutory prohibition, the courts must be deemed to have inherent power to issue a warrant when the requirements of that Amendment are met. *See, e.g., United States v. Torres*, 751 F.2d 875, 877–79 (7th Cir.1984), *cert. denied*, 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985); *Application of the United States of America In the Matter of an Order Authorizing the Use of a Pen Register*, 538 F.2d 956, 959 (2d Cir.1976), *rev'd on other grounds sub nom. United States v. New York Telephone Co.*, 434 U.S. 159, 164, 168, 98 S.Ct. 364, 368, 370, 54 L.Ed.2d 376 (1977) ("The Court of Appeals ... concluded that district courts have the power, either inherently or as a logical derivative of Fed.Crim.Proc. 41, to authorize pen register surveillance upon an adequate showing of probable cause." "We ... agree with the Court of Appeals that the District Court had power to authorize the installation of the pen registers."); *United States v. Southwestern Bell Telephone Co.*, 546 F.2d 243, 245–46 (8th Cir.1976), *cert. denied*, 434 U.S. 1008, 98 S.Ct. 716, 54 L.Ed.2d 750 (1978); *cf. United States v. Giordano*, 416 U.S. 505, 554, 94 S.Ct. 1820, 1845, 40 L.Ed.2d 341 (1974) (Powell, *J.*, concurring in part and dissenting in part) (permissibility of search device not regulated by statute "depends entirely on compliance with the constitutional requirements of the Fourth Amendment").

■ Second, though Rule 41 expressly mentions only "documents, books, papers and any other tangible objects," it is clear that both the Rule and the Fourth Amendment extend to searches for and seizures of intangibles as well. *See United States v. New York Telephone Co.*, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977). In *New York Telephone*, the Court considered a warrant authorizing the use of pen registers that would disclose numbers called from a given telephone line. The Court rejected the contention that a warrant could not lawfully authorize a search for such intangibles, stating that "Rule 41 is not limited to tangible items but is suffi-

ciently flexible to include within its scope electronic intrusions authorized upon a finding of probable cause." *Id.* at 169, 98 S.Ct. at 370. It noted that what is seized in such an endeavor is information, finding that the above-quoted language of Rule 41(b) was

> broad enough to encompass a "search" designed to ascertain the use which is being made of a telephone suspected of being employed as a means of facilitating a criminal venture and the "seizure" of evidence which the "search" of the telephone produces. Although Rule 41(h) defines property "to include documents, books, papers and any other tangible objects," it does not restrict or purport to exhaustively enumerate all the items which may be seized pursuant to Rule 41.

*Id.* (footnote omitted).

The seizure of intangible evidence has been explored principally in the context of the interception of conversations. *See, e.g., Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961) (conversations overheard by means of microphone touching heating duct); *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967) (telephone conversations overheard by means of listening device attached to outside of public telephone booth); *Berger v. New York,* 388 U.S. 41, 54–60, 87 S.Ct. 1873, 1881–84, 18 L.Ed.2d 1040 (1967) (conversations intercepted by wiretap). The principle that neither Rule 41 nor the Fourth Amendment prohibits seizure of intangible property has been applied by the Supreme Court to uphold the interception of nonverbal auditory information, such as that gained through the use of pen registers, *see United States v. New York Telephone Co.,* 434 U.S. at 169–70, 98 S.Ct. at 370–71, and that gained through the placement of location-monitoring beepers in movable property, *see United States v. Knotts,* 460 U.S. 276, 285, 103 S.Ct. 1081, 1087, 75 L.Ed.2d 55 (1983); *see also United States v. Karo,* 468 U.S. 705, 715, 104 S.Ct. 3296, 3303, 82 L.Ed.2d 530 (1984) (beeper).

This principle has also been applied by this Court to uphold a warrant authorizing the gathering of visual information

through the use of a video camera. *See United States v. Biasucci,* 786 F.2d 504, 509 (2d Cir.), *cert. denied,* 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986); *accord United States v. Torres,* 751 F.2d at 883 (upholding warrant authorizing television surveillance of "safe house"); *see also United States v. Taborda,* 635 F.2d 131, 139 (2d Cir.1980) (warrant required for viewing of private area through telescope).

■ Given these authorities, we reject Villegas's contention that the district court had no power to issue a search warrant pursuant to which only intangible evidence would be seized. *Accord United States v. Freitas,* 800 F.2d 1451, 1455 (9th Cir.1986) (ruling that search-without-physical-seizure warrant was authorized, though not validly issued because it (1) failed to make any provision for notice, and (2) lacked particularity as to the intangible property to be seized); *see also United States v. Freitas,* 856 F.2d 1425, 1433 (9th Cir.1988).

■ Finally, we note that Villegas's contention that any authorization for seizure of only intangible property breaches the particularity requirement of the Fourth Amendment is wide of the mark. The particularity requirement means that the warrant must, while indicating the crime under investigation, specify " 'the place to be searched,' " and " 'the persons or things to be seized.' " *Berger v. New York,* 388 U.S. at 56, 87 S.Ct. at 1882 (quoting Fourth Amendment). This requirement was plainly met in the present case. The May 12 warrant authorized a search of

> a farmhouse, a barn, two outbuildings and surrounding land on Johnycake [*sic*] Road, near Little Falls, Herkimer County, New York, owned by B & V Village Farms, Inc., c/o Silk & Slonim, 275 Madison Avenue, New York, New York.

The warrant authorized search for the following specific items: "cocaine, cocaine base, ether, acetone, filter paper, drying racks, sceens [*sic* —screens], [and] records of telephone numbers." Since the warrant went on to forbid a seizure of "tangible property," it obviously authorized the seizure only of visual images of the items for which the search was authorized.

We conclude that the listing of the above items sufficiently indicated that the crime to which the sought evidence was to relate was manufacture of cocaine, and that the warrant was sufficiently particular in its description of the place to be searched and the visual images to be seized.

### b. *Covert Entry Without Notice*

We also reject Villegas's contention that the July 14 warrant should have been suppressed because the May 13 search was initiated by means of a covert entry into the farm or because notice of the entry and search was not given to him until after his arrest on July 14. Though we believe that certain safeguards are required where the entry is to be covert and only intangible evidence is to be seized, we conclude that appropriate conditions were imposed in this case.

■ Certain types of searches or surveillances depend for their success on the absence of premature disclosure. The use of a wiretap, or a "bug," or a pen register, or a video camera would likely produce little evidence of wrongdoing if the wrongdoers knew in advance that their conversations or actions would be monitored. When nondisclosure of the authorized search is essential to its success, neither Rule 41 nor the Fourth Amendment prohibits covert entry. *See, e.g., Dalia v. United States*, 441 U.S. 238, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979) (Fourth Amendment); *Katz v. United States*, 389 U.S. at 355–56 & n. 16, 88 S.Ct. at 513–14 & n. 16 (Rule 41).

In *Dalia*, the Supreme Court held that the "Fourth Amendment does not prohibit *per se* a covert entry performed for the purpose of installing otherwise legal electronic bugging equipment." 441 U.S. at 248, 99 S.Ct. at 1689 (footnote omitted). In reaching this decision, the Court noted its criticisms of warrantless covert entries in *Irvine v. California*, 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561 (1954), and *Silverman v. United States*, 365 U.S. at 511–12, 81 S.Ct. at 682–83; *see, e.g., id.* ("[t]his Court has never held that a federal officer may *without warrant* and without consent physically entrench into a man's office or home, there secretly observe or listen, and relate at the man's subsequent criminal trial what was seen or heard" (emphasis in *Dalia*)). The *Dalia* Court stated that

[i]mplicit in decisions such as *Silverman* and *Irvine* has been the Court's view that covert entries are constitutional in some circumstances, at least if they are made pursuant to warrant.

Moreover, we find no basis for a constitutional rule proscribing all covert entries. It is well established that law officers constitutionally may break and enter to execute a search warrant where such entry is the only means by which the warrant effectively may be executed.

441 U.S. at 247, 99 S.Ct. at 1688. The Court noted that the Fourth Amendment does not require a court to specify the officers' manner of executing a search warrant, and it concluded that a covert entry may be upheld though it has not been expressly mentioned in the warrant. *Id.* at 257–59, 99 S.Ct. at 1693–94.

In *Katz v. United States*, the Court noted that when covert entry and nondisclosure are appropriate, Rule 41 does not require that the owner of the property be given advance or contemporary notice of the entry. *See* 389 U.S. at 355 n. 16, 88 S.Ct. at 513–14 n. 16 ("officers need not announce their purpose before conducting an otherwise authorized search if such an announcement would provoke the escape of the suspect or the destruction of critical evidence"; Rule 41(d) does not impose "an inflexible requirement of prior notice"). In *Dalia*, the Court described the contention that "covert entries are unconstitutional for their lack of notice" as "frivolous." 441 U.S. at 247, 99 S.Ct. at 1688. Thus we conclude that covert entries without contemporaneous notice may be authorized.

Nonetheless, when the authorized entry is to be covert and no tangible property is to be seized, there must be some safeguard to minimize the possibility that the officers will exceed the bounds of propriety without detection. In order to balance the individual's privacy and property interests against appropriate law enforcement interests, all types of searches are subject to some safe-

guards. For conventional searches and seizures, for example, the officers are required to give to the person from whose premises the property was taken, or to leave at those premises, "a copy of the warrant and a receipt for the property taken." Fed.R.Crim.P. 41(d). In the context of electronic interception of wire conversations, Congress has established extensive safeguards, *see* Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1982) ("Title III"), including requirements (a) that the warrant not allow the period of interception to be "longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days" (though renewals are possible), *id.* § 2518(5), (b) that the interception "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under [Title III]," *id.* § 2518(5), and (c) that an inventory be served on the person named in the order "[w]ithin a reasonable time but not later than ninety days after ... the termination of the period of an order or extensions thereof," *id.* § 2518(8)(d). In the context of electronic interception of visual images, which is not regulated by federal statute, the courts have devised some safeguards by analogy to those required by Title III; but they have not necessarily adopted those Title III requirements that do more than implement constitutional requirements. *See, e.g., United States v. Biasucci,* 786 F.2d at 510; *United States v. Torres,* 751 F.2d at 884–85.

In devising appropriate safeguards for a covert-entry search for only intangibles, we note that in many ways this is the least intrusive of these three types of searches. It is less intrusive than a conventional search with physical seizure because the latter deprives the owner not only of privacy but also of the use of his property. It is less intrusive than a wiretap or video camera surveillance because the physical search is of relatively short duration, focuses the search specifically on the items listed in the warrant, and produces information as of a given moment, whereas the electronic surveillance is ongoing and indiscriminate, gathering in any activities within its mechanical focus. Thus, several of the limitations on wiretaps or videotape surveillance, such as duration and minimization, would be superfluous in the context of a physical search.

■ We think two limitations on the issuance of warrants for covert-entry searches for intangibles are appropriate. First, the court should not allow the officers to dispense with advance or contemporaneous notice of the search unless they have made a showing of reasonable necessity for the delay. Though we do not suggest that the officers must meet as rigorous a standard as that imposed by Title III, under which the judge authorizing a wiretap must certify that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(3)(c), the officers must at least satisfy the issuing authority that there is good reason for delay.

Second, if a delay in notice is to be allowed, the court should nonetheless require the officers to give the appropriate person notice of the search within a reasonable time after the covert entry. *See United States v. Freitas,* 800 F.2d at 1456. What constitutes a reasonable time will depend on the circumstances of each individual case. We would, however, agree with the *Freitas* court that as an initial matter, the issuing court should not authorize a notice delay of longer than seven days. For good cause, the issuing court may thereafter extend the period of delay. Such extensions should not be granted solely on the basis of the grounds presented for the first delay; rather, the applicant should be required to make a fresh showing of the need for further delay. *Cf. Berger v. New York,* 388 U.S. at 59–60, 87 S.Ct. at 1883–84 (extensions of wiretap authorization should not be granted without new showings of probable cause therefor).

If these limitations on the withholding of notice are followed, and the court places the usual time limits on the execution of the warrant and the making of the return to the court, we believe the interests of

**1338**

both the individual and the government will be adequately served.

■ We see no deviation from the preferred procedures in the present case. The May 12 warrant provided that notice could be delayed for seven days and that "[s]aid period of delay may be extended by order of this Court upon a showing of good cause." The application presented ample ground for this initial delay. The Delgado affidavit stated, *inter alia,* that the pen register installed on the Johnnycake farm phone was of little help since it revealed that the phone was used infrequently, that the remote setting of the farm made physical surveillance "extremely difficult," and that there were no informants who might be able to infiltrate the group. The agents showed good reason to believe that Villegas had numerous coconspirators who had not yet been identified. The court was justified in permitting the officers to delay the initial notice.

Thereafter, the agents sought a series of additional seven-day extensions. In connection with each request, an agent submitted an affidavit supplying additional information on the progress of the investigation and a statement of the need for further delay of notice. These affidavits, ranging in length from two to six pages, were neither pro forma nor reflective of stale information. In each instance, the court found that the new affidavit showed good cause for the further delay and granted the requested authorization. Since these affidavits provided a substantial basis for the court to conclude that the further delay of notice would lead to evidence of wrongdoing, we defer to the court's decision to permit further delays. *Cf. United States v. Nersesian,* 824 F.2d 1294, 1306 (2d Cir.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987). While we do not suggest that extensions could properly be granted indefinitely, we conclude that the tolerable limit was not exceeded in this case.

In all the circumstances, we reject Villegas's contention that the May 12 warrant was made invalid by the failure to give him notice of the May 13 search until after the July 14 arrests.

■ Finally, we note that even if we were to rule that the district court should not have authorized the covert entry in May, there would be no basis on which to suppress the July 14 warrant. We do not find in the record any suggestion that during the May 13 search the officers found any records or other writings that substantially assisted in their further investigations. What they gained from that search was confirmation rather than new leads. There can be no doubt that, even without any inspection of the interior of the Johnnycake farm buildings, the representations in the affidavit submitted in support of the May 12 warrant, together with the information obtained in the further investigation and in the drive-by observations described in later affidavits, all of which were submitted to the court in support of the July 14 warrant, constituted ample probable cause for the issuance of a warrant to search and seize any evidence of a cocaine manufacturing operation at Johnnycake farm.

## B. *The Sufficiency of the Evidence*

Gomez–Sanchez, Jaramaillo, Johana Torrez, Valbuena, and Heriberto Torrez contend that the evidence was insufficient to support their convictions. These defendants contend that the verdicts were against the weight of the evidence and that the evidence showed no more than that they were present at the farm and not that they participated in any of the cocaine-related activities. We reject their arguments.

■ In order to prove a conspiracy, the government must present " 'some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it.' " *United States v. Sanchez Solis,* 882 F.2d 693, 696 (2d Cir.1989) (quoting *United States v. Gaviria,* 740 F.2d 174, 183 (2d Cir.1984)). Both the existence of the conspiracy and a given defendant's participation in it with

the requisite criminal intent may be established through circumstantial evidence. *See, e.g., United States v. Tutino,* 883 F.2d 1125, 1129 (2d Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990); *United States v. Young,* 745 F.2d 733, 762 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985).

■ In challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden. *United States v. Chang An–Lo,* 851 F.2d 547, 553 (2d Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988); *United States v. Buck,* 804 F.2d 239, 242 (2d Cir. 1986). When we review such a challenge, we must consider pieces of evidence in conjunction, not in isolation, *United States v. Brown,* 776 F.2d 397, 403 (2d Cir.1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); *United States v. Geaney,* 417 F.2d 1116, 1121 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), and we must credit every inference that could have been drawn in the government's favor, *United States v. Bagaric,* 706 F.2d 42, 64 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983); *United States v. Carson,* 702 F.2d 351, 361 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983). The weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal. *See, e.g., United States v. Roman,* 870 F.2d 65, 71 (2d Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989). If, from the evidence viewed in this light, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the conviction must be sustained." *United States v. Chang An–Lo,* 851 F.2d at 554; *United States v. Fiore,* 821 F.2d 127, 128 (2d Cir. 1987).

In making the present sufficiency challenges, defendants rely heavily on *United States v. Soto,* 716 F.2d 989 (2d Cir.1983). In *Soto,* law enforcement agents raided a New York City apartment and found Soto there asleep, with her child, in the drug "cutting room" of the apartment. The evidence established that Soto had arrived in the United States three weeks earlier and had lived in the apartment since then. There was nothing else to connect her with the narcotics operation. A ledger book in the apartment that listed names of the narcotics operation's employees did not include Soto's name. We held that the evidence of her presence was insufficient to support a conviction for conspiracy: "[a]bsent some showing of purposeful behavior tending to connect defendant with the acquisition, concealment, importation, use or sale of drugs or firearms, participation in the conspiracies cannot be proven by presence alone." *Id.* at 991–92; *see also United States v. Gaviria,* 740 F.2d at 183–84 (evidence that defendant was seen with drug dealer, had been in apartment where cocaine was found and lied about being there, and that a small quantity of cocaine was found in defendant's car was insufficient to support a conviction for conspiracy to distribute cocaine and to possess cocaine with intent to distribute).

Viewing the evidence as a whole in the light most favorable to the government, we conclude that as to each defendant the proof, discussed below, showed more than mere presence and was sufficient to support their convictions.

### 1. Gomez–Sanchez, Jaramaillo, and Heriberto Torrez

■ The basement of the farm was the hub of the manufacturing operation, where the cocaine was leached from charcoal and processed into cocaine hydrochloride. When the agents entered the farmhouse, Gomez–Sanchez, Jaramaillo, and Heriberto Torrez were found in the room of the basement used to convert cocaine base into cocaine hydrochloride. The hands, arms, and clothing of each of them were covered with charcoal dust.

Though Jaramaillo testified that he had arrived at the farm only that morning, knowing nothing of the unlawful operations, and had nothing to do with the operation, the jury was entitled to discredit this testimony. He said that he had been at the

farm all day; yet he claimed he had heard nothing and had talked to no one. He testified that he had spent the entire day in the living room; yet he claimed he had not seen the contraband items lying in the open in that area. He stated that he had done nothing but watch television and had never been to the basement until the officers arrived; yet his hands, arms, and clothes were covered with charcoal dust when he was arrested moments after they arrived. Jaramaillo's testimony, which was scarcely credible, apparently was disbelieved by the jury, and we may not disturb that assessment.

Gomez–Sanchez did not testify at trial but relied on Jaramaillo's testimony that Gomez–Sanchez had arrived at the farm that afternoon of July 14 and that the two of them had remained in the living room the rest of the day. As discussed above, the jury plainly did not credit Jaramaillo's testimony. In addition, though Gomez–Sanchez too argued that he had not left the living room until he ran to the basement at the officers' knock at the door, Delgado testified that when arrested Gomez–Sanchez had charcoal dust not only on his hands, arms, and clothing, but even under his fingernails.

Heriberto Torrez's sufficiency challenge is frivolous. In addition to being found in the manufacturing area with his body and clothing covered with charcoal dust, he had received a shipment of chemicals in New York City that were later transported to the Johnnycake farm for use in manufacturing the cocaine. There was also evidence that his fingerprints were in the cocaine record books found at the farm, and that he was Villegas's partner in the pending purchase of another farm in the area that was being outfitted for use as a cocaine factory.

In sum, the proof showed far more than the mere presence of Gomez–Sanchez, Jaramaillo, and Heriberto Torrez in the farmhouse and was ample to support their convictions.

### 2. Valbuena

In making his sufficiency challenge, Valbuena relies on the fact that he was found on the main floor, rather than in the basement with the manufacturing equipment. He too contends that the evidence showed only that he was present at the farmhouse and not that he performed any acts that could link him with the conspiracy. Again, we disagree.

Though Valbuena was not in the basement when the officers arrived, the front of his clothing too was covered with charcoal dust. When the agents found him, he was hiding fully dressed in a bathroom shower stall. The jury was entitled to infer from the evidence that he had had contact with the bags of charcoal and from his furtiveness that he had knowingly participated in the manufacturing operation.

### 3. Johana Torrez

Johana Torrez was found on the first floor of the farmhouse, not in the basement, and there was no evidence that her body or clothing bore charcoal dust. Nonetheless, we are not persuaded that the evidence as to her showed merely presence.

There was evidence, *inter alia*, that Johana prepared the meals for the men who processed the cocaine. In addition, there was evidence from which the jury could infer that Johana made the cheesecloth packets that were used for leaching the cocaine out of the charcoal. When the agents arrived, Johana was found in the living room standing next to a sewing machine in which the stitching of a cheesecloth packet was in progress. On the table with the sewing machine was a large roll of cheesecloth and several completed cheesecloth packets, suggesting that the packet in progress was just one of many being created. The inference that the sewing was being done by Johana was permissible from the fact that the other two defendants found on the first floor were not near the sewing table. Villegas had just returned to the farm from grocery shopping; Valbuena was hiding in a shower. In any event, Valbuena was covered with charcoal dust, and we have seen no suggestion in the record that there was any charcoal dust on the cheesecloth being sewn. The jury

was entitled to infer that the arrival of the agents had interrupted the sewing of a cheesecloth packet, that that project was part of the ongoing preparation of essential supplies for the manufacturing operation, and that Johana had been the sewer.

There was also ample evidence that Johana must have been aware of the nature of the operations at Johnnycake farm. Though the setting was rural and remote, there was a pervasive smell of chemicals. Cocaine and narcotics paraphernalia were scattered throughout the house. Further, seven kilograms of cocaine were being dried in the second-floor closet in which a woman's clothes were found. Johana was the only woman at the farm at the time. Though there was another upstairs closet, there was no evidence that any narcotics-related items were found in it. From the selection of Johana's closet as a preferred location for the final drying of the cocaine, it could easily be inferred that Johana was a trusted member of the conspiracy.

In sum, the jury could reasonably have inferred that Johana Torrez knowingly participated in the cocaine manufacturing operation by providing meals for the workers, making leaching bags for the charcoal, and using her closet for the drying of the processed cocaine. We conclude that the evidence was sufficient to support her conviction.

C. *Villegas's Claim That He Was Not Competent To Stand Trial*

■ Villegas's other major contention on this appeal is that he was not competent to stand trial because in December 1987, while he was detained and awaiting trial, he contracted meningococcal meningitis, an infection of the lining of the brain which can cause damage to the neurological functions. In June 1988, after his recovery and a period of rehabilitation, Villegas contended that he suffered from amnesia, both as to current information (anterograde amnesia) and as to the events surrounding his arrest (retrograde amnesia), and he moved pursuant to 18 U.S.C. § 4241 (1988) for an order declaring him incompetent to stand trial.

■ On such a motion, the court is required to determine whether "the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense...." 18 U.S.C. § 4241(d). A defendant's amnesia about events surrounding the crime will not automatically render him incompetent to stand trial. *United States v. Sullivan*, 406 F.2d 180, 186 (2d Cir.1969). Rather, the propriety of trying a given amnesiac defendant must be determined in light of his own individual circumstances. Factors to be considered include whether the defendant has any ability to participate in his defense, whether the amnesia is temporary or permanent, whether the crime and the defendant's whereabouts at the time of the crime can be reconstructed without his testimony, whether the government's files will be of assistance in preparing the defense, and whether the government's case is strong or weak. *See, e.g., United States v. Rinchack*, 820 F.2d 1557, 1569 (11th Cir.1987); *United States v. Swanson*, 572 F.2d 523, 526–27 (5th Cir.), *cert. denied*, 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152 (1978).

A defendant's competence to stand trial is a question of fact, *see, e.g., Maggio v. Fulford*, 462 U.S. 111, 113, 103 S.Ct. 2261, 2262, 76 L.Ed.2d 794 (1983) (per curiam); *Matusiak v. Kelly*, 786 F.2d 536, 545 (2d Cir.), *cert. dismissed*, 479 U.S. 805, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986); *see also Marshall v. Lonberger*, 459 U.S. 422, 436–37, 103 S.Ct. 843, 851–52, 74 L.Ed.2d 646 (1983) (defendant's comprehension of the charges against him), and the district court's determination of that competence will not be overturned unless it is clearly erroneous, *United States v. Gold*, 790 F.2d 235, 240 (2d Cir.1986). Where there are two permissible views of the evidence as to competency, the court's choice between them cannot be deemed clearly erroneous. *See generally Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985); *Unit-*

ed States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949).

At the competency hearing in the present case, Villegas's psychiatrist, Dr. Daniel DeSole, testified that in his opinion, based on Villegas's medical history and his responses to certain tests, Villegas was suffering from a dementia ("a chronic organic brain syndrome") that was caused by his bout of meningitis. Dr. DeSole opined that Villegas was suffering from both anterograde and retrograde amnesia and was not malingering.

The government called two witnesses. Dr. Abraham Halpern, a psychiatrist, testified that the medical tests disclosed no significant organic disorders as a result of the meningitis. He testified that Villegas exhibited some degree of amnesia relating "almost exclusively" to the events surrounding his July 1987 arrest, but that Villegas was able to recall events prior to that date. In Dr. Halpern's opinion, this limited amnesia was not related to the meningitis, and Villegas was able to consult with his lawyer with a reasonable degree of rational understanding and possessed a rational understanding of the proceedings against him.

The government's second witness was Dr. Edward Wong, chief physician at the federal prison in which Villegas was then detained. Dr. Wong testified to his opinion, based on his daily observations of Villegas, that Villegas's behavior varied depending on whether or not Villegas thought he was being watched. According to Dr. Wong, if Villegas thought he was being observed or evaluated he would act "withdrawn and distracted." However, when interacting with someone he saw on a regular basis, Villegas was "more spontaneous and communicative," not just "sit[ting] there and star[ing] into space." In Dr. Wong's opinion, Villegas's behavior during evaluations was an affectation and not a genuine amnesiac condition resulting from meningitis. Dr. Wong also opined that Villegas was able to understand the proceedings against him and to communicate with his attorney if he so desired.

At the conclusion of the hearing, the district court found that Villegas was not suffering from amnesia with respect to current information, finding that the anterograde "symptoms displayed by the defendant are feigned." The court noted, however, that, given the testimony of the two psychiatric experts, it could not rule out the possibility that Villegas was suffering to some degree from an inability to remember the events surrounding his arrest. Nonetheless, the court observed that there had been an interval of several months between Villegas's arrest and the onset of the meningitis, and that undoubtedly Villegas had assisted his attorney in preparing his defense during that period. In addition, it found that the critical events surrounding his arrest could be reconstructed because, inter alia, the government had indicated its willingness to make its files available to Villegas's attorney, and there were a number of witnesses who could aid in the reconstruction of events surrounding the arrest. In all the circumstances, the district court concluded that Villegas was competent to stand trial.

The record fully supports the district court's findings. It was within the province of that court, as the finder of fact, to decide which of the competing medical views to credit, and we cannot say that its finding that Villegas was feigning anterograde amnesia was clearly erroneous. Thus, we must accept the findings that Villegas was able to understand the nature and consequences of the proceedings against him and that his amnesia was limited to the events surrounding his arrest.

The court's further finding that Villegas was competent to stand trial despite that limited amnesia is also unimpeachable. The facts as to Villegas's actions in purchasing the Johnnycake farm, Villegas's presence there, and the presence of a cocaine-manufacturing operation on the farm after he purchased it were all fully provable through the testimony of other witnesses. Further, the record reveals that the preparation of Villegas's defense was well underway prior to his illness. Villegas had already, for example, sought discovery from the government, moved to suppress

the evidence against him, and requested a severance on the ground that his defense was inconsistent with the defenses of certain other defendants. In order to make these motions, Villegas's attorney must have received much information from Villegas before any amnesia occurred. In all the circumstances, we find no basis for disturbing the district court's finding that Villegas was competent to stand trial.

### D. *Berrio's Claim of Duress*

Prior to trial, the government moved for an order *in limine* precluding any of the defendants from presenting to the jury a defense asserting that he or she had participated in the Johnnycake farm operations under duress. Berrio opposed the motion because he wished to assert that he had gone to work at Johnnycake farm without knowing of the cocaine operations, and that he had remained there only under duress. Insofar as is pertinent here, the district court ruled prior to trial that Berrio could not present such a defense, and it adhered to this ruling after twice reconsidering the matter during the trial.

On appeal, Berrio contends principally (1) that it was improper for the district court to rule on the government's preclusion motion prior to trial because it forced Berrio prematurely to choose between his Fifth Amendment right to remain silent and his right to present a defense at trial, and (2) that, in any event, the court erred in not permitting the defense. These contentions are without merit.

### 1. The Propriety of Ruling Prior to Trial

■ Berrio's contention that it was improper for the district court to rule on the government's preclusion motion prior to trial need not detain us long. The Federal Rules of Criminal Procedure allow pretrial motions seeking limitations on the evidence to be offered at trial, and the district judge may rule on such a motion prior to trial so long as it "is capable of determination without the trial of the general issue." Fed.R. Crim.P. 12(b); *see* Fed.R.Crim.P. 12(e). These provisions authorize the court to rule on a motion to preclude a defendant from presenting a duress defense where the government contends that the evidence in support of such a defense would be legally insufficient. *See, e.g., United States v. Alicea*, 837 F.2d 103, 107 (2d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 88, 102 L.Ed.2d 64 (1988); *United States v. Bifield*, 702 F.2d 342, 346 (2d Cir.), *cert. denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983). The court does not, in ruling on the motion, decide the merits of the defense except to determine whether there is sufficient evidence as a matter of law, to permit the question to be submitted to the jury. If the defendant can make a prima facie showing as to each of the elements of a duress defense, *see* Part II.D.2. below, the court merely denies the motion to preclude and allows the question to be submitted to the jury. Where the evidence to be presented would be insufficient as a matter of law, however, no proper interest of the defendant would be served by permitting his legally insufficient evidence to be aired at trial, and interests of judicial economy suggest that the jury should not be burdened with the matter. These principles neither foreclose a defendant from presenting any legally sufficient evidence of duress at trial nor affect his right to present evidence on any other subject. *See, e.g., United States v. Alicea*, 837 F.2d at 107 ("only evidence as to the asserted defense is precluded"); *United States v. Bailey*, 444 U.S. 394, 416, 100 S.Ct. 624, 638, 62 L.Ed.2d 575 (1980); *United States v. Bifield*, 702 F.2d at 350.

Accordingly, the district court in the present case properly ruled prior to trial on whether or not the defendants' proposed duress defenses could be deemed sufficient as a matter of law, and whether, therefore, they should be allowed to present such defenses to the jury.

### 2. The Merits of the Proposed Defense

■ Turning to the merits of Berrio's proposed duress defense, we conclude that the defense was properly excluded by the district court. In order to establish a claim of duress such as to constitute a

legal excuse for criminal conduct, a defendant must show that (a) at the time of his conduct he was subjected to actual or threatened force, (b) the force or threat was of such a nature as to induce a well-founded fear of impending death or serious bodily harm, and (c) there was no reasonable opportunity to escape from the force or threat other than by engaging in the otherwise unlawful activity. *See, e.g., United States v. Mitchell*, 725 F.2d 832, 837 (2d Cir.1983); *United States v. Alicea*, 837 F.2d at 106; *United States v. Agard*, 605 F.2d 665, 667 (2d Cir.1979). The duress defense will not be submitted to the jury unless the defendant has presented some evidence on each of these elements. *United States v. Mitchell*, 725 F.2d at 837.

■ Evidence of a mere "generalized fear" does not satisfy the requirement of a well-founded fear of impending death or serious bodily harm. *See, e.g., United States v. Esposito*, 834 F.2d 272, 276 (2d Cir.1987). Rather, there must have been a threat that was specific and prospects of harm that were immediate. *See United States v. Agard*, 605 F.2d at 668 ("talk of gunplay" and "vague threatening motions" insufficient); *United States v. Jennell*, 749 F.2d 1302, 1305 (9th Cir.1984) ("[F]ear alone is not sufficient to make a *prima facie* case of duress."), *cert. denied*, 474 U.S. 837, 106 S.Ct. 114, 88 L.Ed.2d 93 (1985).

The district court heard three offers of proof with respect to Berrio's proposed duress defense: the first at an *in camera* hearing prior to trial; the second in the presence of the defendants, but in the absence of the jury, midway through trial; and the third *in camera* near the end of the trial. In each instance, Berrio's offers fell far short of the above standards.

At the pretrial hearing, attended only by Berrio's attorney and his interpreter, counsel stated that Berrio would testify as follows. In New York City Berrio had been offered a job by an old Colombian acquaintance; he accepted, believing the job was in New York City. He was picked up in a truck to go to this job, and when he found himself on a long trip, he asked where he was going and was "told basically to shut up." Berrio asked no more questions. He arrived at Johnnycake farm three days before the arrests. Once at the farm, Berrio quickly realized that there was an ongoing narcotics operation and inferred that his old acquaintance was involved with one of the Colombian drug cartels, and Berrio was therefore fearful:

> [Ms. VAIDA, Berrio's attorney]:....
>
> He was scared on that realization and as soon as he realized where he was, he was afraid. [H]e was given instructions, very detailed instructions as to what he was to do. He, at one point, asked—do you want me to name which co-defendant it is? He asked the co-defendant if he could leave, and was told nobody was going anyplace until the job was done.
>
> THE COURT: *Was he threatened or just told he could not leave?*
>
> Ms. VAIDA: *He was told he could not leave. He assumed, because of the illegal activity that was there that weapons were there. As far as whether or not he actually saw a weapon he believes that he saw a gun in the belt of one of the men that [sic] was there.*

(September 29, 1988 Hearing Transcript at 8 (emphasis added).) Counsel argued that because of Berrio's Colombian background, Berrio "kn[ew] that if he was to leave they would kill him."

> THE COURT: ... [I]s it your position that in the truck, on his way to Herkimer from Queens, he had some questions and he was told to shut up? He doesn't have to know anything, and the less he knows the better?
>
> Ms. VAIDA: Right.
>
> THE COURT: And then after arriving at the farm in Herkimer he was again told by one of the co-defendants that no one could leave until all of the work was finished?
>
> Ms. VAIDA: Right, correct.
>
> THE COURT: And that basically there are the two conversations between him and the co-defendant, and a third party from which you intend to present a defense of duress, because of his cultural

background, of course, but those are the two conversations?

Ms. VAIDA: ... [T]hat is basically the gist of it.

THE COURT: And he saw no weapons other than possibly he saw a gun in the belt of one of the individuals?

Ms. VAIDA: That is correct, your Honor. But he assumed, because of the nature of the activity, the size of the cocaine farm, and because of what he knows about how these cartels operate that the place was well protected....

(*Id.* at 11–12.)

This pretrial offer of proof was entirely insufficient to present any prospect that Berrio could make a prima facie showing of duress. As the emphasized portion of the above colloquy reveals, his testimony was to be not so much that he was threatened as merely that he was told he could not leave; he assumed the rest. Such assumptions are insufficient to establish a prima facie case of duress.

When Berrio was allowed to make his first new offer of proof during trial, he testified in open court in the absence of the jury. He stated that he had been afraid to leave Johnnycake farm because of the reputation of the Colombian cartels for violence. He also called as a witness an expert in Latin American studies to testify about the activities and reputation of Colombian cartels. In elaborating on his stay at Johnnycake farm, Berrio testified he had been brought to the farm by a man named Carlos Velez; that when Berrio discovered the nature of the operation, he asked Velez if he could leave, and Velez responded that he "could not leave until everything was done." He testified that Velez left the farm after Berrio had been there only one day, but that before he left, he told Berrio "to help Mr. Heriberto Torrez." Other than Velez, Berrio received orders only from Heriberto Torrez. Berrio never asked Heriberto if he could leave because he "thought it was the same relationship between him and Mr. Velez." He never saw Heriberto with a gun.

On the basis of this proffer, the court again denied Berrio permission to present his duress defense. It concluded that, even viewing the evidence in the light most favorable to Berrio, his duress defense would be insufficient as a matter of law because he did not allege "that Heriberto Torrez in any way threatened or implied any threat to Mr. Berrio" and thus there was "no showing that there was a well-founded fear of imminent death or serious bodily harm ... beyond the point when Velez left the area." (Trial Transcript at 1772.)

Some days later, Berrio's counsel represented to the court that at the midtrial hearing Berrio had been afraid to testify freely because of the presence of Heriberto Torrez. Toward the end of trial, the court therefore allowed Berrio another opportunity to make an offer of proof in the absence of the other defendants. On this final occasion, Berrio's attorney told him he was being given this opportunity "so that you can freely testify." With regard to his stay at Johnnycake farm, Berrio reiterated that Velez had told him he could not leave and that when Velez left Velez told him he should obey Heriberto Torrez. Describing Heriberto's conduct at Johnnycake farm, Berrio testified that Heriberto spoke to him in a "very rude manner." His entire description of his encounters with Heriberto at the farm was as follows:

.... he told me very rude, in a very rude manner, using words that I don't want to repeat here, he asked me what was wrong with me. He asked me where I was coming from. And since I had, well, sort of in a very, very humble way told him that I did not want to be there, he asked me where, where are you coming from and he told me to remember that no one would leave that place until that was done, and to shape up and what kind of a man I was, that I didn't look like a man.

Q Were you afraid of [Heriberto] Torrez when you were at the farm?

A Yes. Because, well, it was the question of the way that he spoke to me. He spoke to me different from the way he spoke to them. He spoke to me, shouting at me and it was not the same way that he spoke to the other men. And I thought that since there was

this difference, there was possibly a relationship between him and Mr. Velez.

Q Was the presence of Velez and [Heriberto] Torrez the reason that you did not try to leave the farm?

A Yes, obviously.

. . . .

Ms. VAIDA: Is there anything you want to tell the Court, did we cover everything, John?

THE WITNESS: That's the whole truth. What else can I say?

(Trial Transcript at 2080–81.) The district court found in this testimony no basis for allowing the duress defense.

In light of the record, Berrio's challenge to the exclusion of his proposed duress defense borders on the frivolous. Berrio failed to present evidence of more than a generalized fear, based on the reputation of the Colombian cartels, that caused him to remain at the farm. He did not identify any threats by Heriberto Torrez nor any specific threats by anyone else. He did not proffer any evidence that he had been in immediate danger. In short, Berrio made no showing of a well-founded fear of imminent death or serious bodily harm.

### E. *The Severance Contentions*

Villegas, Johana Torrez, Berrio, Bolivar, and Heriberto Torrez contend that their trials should have been severed from the trial of their codefendants. Villegas, Berrio, and Bolivar contend that the joint trial prejudiced them because their defenses were antagonistic to the defenses of the other defendants. Johana Torrez, Berrio, Bolivar, and Heriberto Torrez contend that they were prejudiced by spillover from the government's case against the other defendants. We find merit in none of these contentions.

The disposition of a motion for severance pursuant to Fed.R.Crim.P. 14 is committed to the sound discretion of the trial judge. *United States v. Potamitis*, 739 F.2d 784, 790 (2d Cir.), *cert. denied*, 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984); *United States v. Cody*, 722 F.2d 1052, 1061 (2d Cir.1983), *cert. denied*, 467 U.S. 1226, 104

S.Ct. 2678, 81 L.Ed.2d 873 (1984). In challenging a trial court's denial of a severance motion, a defendant must demonstrate that he suffered "substantial prejudice" as a result of the joint trial. *United States v. Potamitis*, 739 F.2d at 790. This is a heavy burden, requiring a showing that a "miscarriage of justice" has occurred. *Id.*

#### 1. The Claims of Antagonistic Defenses

When the challenge to the denial of severance is premised on a claim that two defenses were antagonistic, a defendant satisfies his burden of showing substantial prejudice only if it can be said that " 'the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant.' " *United States v. Potamitis*, 739 F.2d at 790 (quoting *United States v. Carpentier*, 689 F.2d 21, 27–28 (2d Cir.1982), *cert. denied*, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983)). The mere fact that codefendants seek to place the blame on each other is not the sort of antagonism that requires a severance. *United States v. Casamento*, 887 F.2d 1141, 1154 (2d Cir. 1989) ("fingerpointing" not sufficient), *cert. denied*, —— U.S. ——, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). Nor is it sufficient that one defendant contends that another coerced him to engage in the unlawful conduct if the jury could believe both that contention and the codefendant's defense. *See United States v. Swingler*, 758 F.2d 477, 494–96 (10th Cir.1985) (severance not required where one codefendant claimed he was coerced by members of motorcycle gang to participate in narcotics conspiracy, and gang member codefendant disclaimed involvement in conspiracy). Given this framework, the contentions of Villegas, Berrio, and Bolivar must fail.

Villegas's claim is that because it was plain that he had purchased the farm, the defenses of Berrio and Gomez that they were coerced into working at the farm were antagonistic to the defense of Villegas. Villegas's "defense" was that he had sufficient wealth to purchase Johnnycake farm with his own funds and that the evi-

dence was insufficient to show that the purchase was financed by narcotics dealers. Neither Berrio nor Gomez testified that he had been coerced by Villegas. Gomez testified that he had been coerced only by a man named Arturo. The mere fact that the name "Arturo" was also found in one of the notebooks discovered at the farm did not make Villegas's defense of innocence fatally inconsistent with that of Gomez. The jury could, as a matter of logic, have believed both that Villegas had purchased the farm with his own funds and that no one had been coerced by Villegas.

 Bolivar's claim of antagonistic defenses is flimsy in the extreme. Its premise is that since Bolivar was found in the basement with Gomez, the jury would infer that it was Bolivar who coerced Gomez into working at the farm. Again, however, Gomez did not testify that he was threatened by Bolivar but only by Arturo. Bolivar presented no defense other than his argument that the evidence was insufficient to convict him. The jury could logically have accepted that position while finding that Gomez had been coerced by Arturo.

 Finally, Berrio's claim is that his coercion defense was generally antagonistic to virtually all of the other defendants. In support of this contention, he points out that other defendants objected frequently to his examination of certain witnesses (*see, e.g.,* Part II.F.2. below), presenting to the jury the appearance of "significant conflict." This vague and general assertion is entirely insufficient to show the kind of substantial prejudice that warrants a new trial for denial of severance.

### 2. The Claims of Spillover

 A defendant who claims that he is entitled to a new trial because of prejudicial spillover bears an extremely heavy burden. *United States v. Friedman,* 854 F.2d 535, 563 (2d Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). In reviewing such a claim, we cannot assume that a multi-defendant drug trial is beyond the ken of the average juror, *see United States v. Moten,* 564 F.2d 620,

627 (2d Cir.) (multi-defendant narcotics trial "not so complicated as to be beyond the comprehension of the jury"), *cert. denied,* 434 U.S. 942, 98 S.Ct. 438, 54 L.Ed.2d 304 (1977), and we will look to a number of factors to determine whether the joinder was an abuse of discretion. We will consider, for example, to what extent the evidence presented at the joint trial would have been admitted at a single-defendant trial because of the alleged conspiratorial nature of the illegal activity. *See United States v. Bari,* 750 F.2d 1169, 1178 (2d Cir.1984), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). We will also consider whether the jury was instructed to assess the evidence against each defendant separately from the proof against the other defendants, *see United States v. Carson,* 702 F.2d at 367, and whether there is an indication, such as different verdicts with respect to different defendants, that the jury heeded these instructions, *see id. See generally United States v. Casamento,* 887 F.2d at 1153. No one of these factors is dispositive.

 In the present case, though the jury returned verdicts of guilty against all defendants on all counts, we see no indication that Johana Torrez, Berrio, Bolivar, or Heriberto Torrez was the victim of prejudicial spillover. We note that we have rejected the claims of Johana Torrez and Heriberto Torrez that the evidence was insufficient to support their convictions, *see* Part II.B. above, and that Berrio and Bolivar, appropriately, have not challenged the sufficiency of the evidence to convict them. Since each of these four defendants was charged with being a member of the cocaine manufacturing conspiracy and there was sufficient evidence to connect each with the conspiracy, all of the evidence as to each of the other defendants' acts in furtherance of the conspiracy was admissible against each of them.

In charging the jury, the trial court repeatedly stated the importance of considering "each defendant separately and individually ... based upon the evidence which has been presented against him or her." It noted that a verdict of guilty against one

defendant "does not mean that you shall necessarily find the other defendants guilty of the same charges," and emphasized that the jury "must determine the guilt or innocence of each of these defendants separately as to the count of conspiracy.... Each one stands or falls on the evidence which has been presented against that particular defendant." The jury plainly took these instructions seriously. During its deliberations, for example, it asked which documents had been admitted against which defendants.

Given the nature of the case, the evidence against these defendants, the instructions by the trial judge, and the questions of the jury, we find no merit in the claims of prejudicial spillover.

### F. Other Claims

Defendants also make several other arguments that we find to be without merit. Only Gomez's claim that he was denied a competent interpreter and Garcia's contention that a new trial is required because of references during trial to violence and the "mafia" warrant discussion.

### 1. Gomez's Claim That He Was Denied a Competent Interpreter

■ Gomez claims that he was denied a fair trial because at the pretrial hearing as to his then-proposed duress defense he was not provided with a competent interpreter. The record does not support his contention.

As indicated above, prior to trial a number of the defendants sought permission to present a defense that they had been present at Johnnycake farm only under duress. Gomez testified at a pretrial hearing, through an interpreter, and the court ruled that he could present his duress defense at trial.

At trial, Gomez testified, again through an interpreter, that he had worked at a number of jobs in Florida since coming to the United States from Colombia in 1986 and that he had come to Johnnycake farm on the morning of July 14 because he was promised work there by a man named Arturo. Arturo had bought him a plane ticket and then met him at the local airport.

Shortly after arriving at the farm, Gomez realized something "abnormal" was going on, and he told Arturo, who he thought was "either the owner or the person in charge or something like that," that he wanted to leave. Gomez testified that, in response, Arturo threatened to kill Gomez or his family if he "tr[ied] anything."

On cross-examination, the government sought to discredit Gomez's testimony on direct by, *inter alia*, pointing to several inconsistencies between his trial testimony and his testimony at the pretrial hearing. For example, Gomez testified at trial that they had left the local airport "sometime near midnight, maybe 1:00, 2:30 or 1:00, I don't remember." The government brought out that at the hearing he had testified that they "left around 6:00 in the morning, more or less." Gomez contends that his trial was rendered fundamentally unfair because the answers with which he was impeached had been incorrectly translated. We find no basis for reversal.

■ A defendant in a federal prosecution who speaks only or primarily a language other than English such as to inhibit his comprehension of judicial proceedings, is entitled to have the court appoint for him a certified or otherwise qualified interpreter. *See* 28 U.S.C. § 1827(d)(1) (1982). Implicit in this requirement is the notion that the interpreter should be competent to render accurate translations. *See United States v. Moon*, 718 F.2d 1210, 1213 (2d Cir.1983), *cert. denied*, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984). Like other complaints about the conduct of trial, a challenge to the competence of the interpreter may be waived if not raised in timely fashion. *See Valladares v. United States*, 871 F.2d 1564 (11th Cir.1989) (Powell, *J.*, sitting by designation). "Only if the defendant makes any difficulty with the interpreter known to the court can the judge take corrective measures. To allow a defendant to remain silent throughout the trial and then, upon being found guilty, to assert a claim of inadequate translation would be an open invitation to abuse." *Id.* at 1566.

In the present case, the substance and timing of Gomez's present argument leave us unpersuaded that he was denied a fair trial. Gomez made no objection to the interpreter during the pretrial hearing. The transcript of the pretrial hearing was available and filed with the court a month before the trial started, some two months before Gomez testified. On cross-examination, Gomez conceded that he had previously looked at the transcripts, stating that he and his attorney had said, "this was a terrible translation." Yet in that two-month period prior to his testimony, Gomez took no action to alert the court that there was any error in the translation. He raised no problem until cross-examination revealed his inconsistent answers.

Even after the cross-examination, Gomez made no showing that the interpreter was not competent. Except for four responses with which Gomez was impeached, Gomez did not point to any part of the translation that he contended was not accurate. Nor did he present an affidavit from anyone else who attended the hearing, or adduce any evidence other than his own bald assertion, to show that the four answers of which he now complains were in fact inaccurate.

Finally, we note that the government's other refutation of Gomez's trial testimony was far more damaging than the inconsistencies in the hearing testimony. For example, though Gomez testified that he had never been in the room on the left side of the basement, that was the very room in which he was arrested. Though he testified at trial that he had had no previous connection with any of the other defendants, his address books contained the names and telephone numbers of several individuals who were also listed in the address books of Villegas and Heriberto Torrez. And though he testified at trial that he had arrived at the farm only on the day of the arrests, he told the officers immediately after his arrest that he had been there for 15 days.

Given the weakness of Gomez's showing that the interpreter was not competent, his failure to make any such argument in a timely fashion, and the weight of the other evidence discrediting his testimony, we cannot conclude that the district court erred in denying Gomez a new trial.

### 2. The References to Violence and the "Mafia"

 Notwithstanding the court's refusal to permit Berrio to present a defense of duress, his attorney argued at trial that Berrio was not a knowing and voluntary participant in the Johnnycake farm operations because of the control of narcotics operations by the violent Colombian cartels. In support of this argument, his counsel questioned DEA Agent Fred Marano in part as follows:

Q. [By Ms. Vaida] And the processing of cocaine both in Colombia and in the United States would be handled by what's called the Colombian mafia or Colombian cartel, would that be fair to say?

MR. SCHLENKER [Counsel for Villegas]: I'm going to have to object, judge, this opens the door to just—

THE COURT: No, there was something in the direct examination referring to a cartel. If you're trying to get an explanation of that comment made by Special Agent Marano, I'll allow it.

. . . .

THE WITNESS: The majority of that cocaine is linked with a cartel, yes, in Colombia.

BY MS. VAIDA:

Q. Would you explain to the jury what a cartel is?

A. It is a, it's a large group of very powerful people in Colombia who have banded together to develop, process cocaine in Colombia and then effect its trans-shipment to the United States and enjoy a very successful trafficking route.

Q. And is the word cartel synonymous with mafia?

MR. SCHLENKER: I'm going to object, your Honor.

THE COURT: No, not if you can answer that.

MR. SCHLENKER: I thought that the Government said that there was no such word, at one time.

THE COURT: Depends on which branch of the Government you're talking to. Can you answer that, question, Agent Marano?

A. I've never considered mafia and cartel synonymous, although I think very similar. My perception of the 2 clubs, if you will, is very similar.

Q. Maybe I'm not phrasing this right. During your investigations over the past 15 years into the Colombian cartel, would it be fair to say that often the word Colombian mafia is often used instead [of] Colombian cartel?

A. I have seen it used, yeah.

. . . .

Q. Now, you mentioned that you were specifically involved with 8 or 9 drug labs in the United States, is that correct?

A. Yes.

Q. And one of those drug labs was the Minden lab, is that correct?

A. Yes.

Q. And in your investigation and involvement with the Minden lab, there were certain threats made to individuals that were arrested in that case, is that correct?

A. I'm sorry, I'm not aware of that. I wasn't involved with that aspect of the case.

Q. Were you aware of a tongue that was mailed to the Montgomery County jail in that case?

A. I heard something about that, yes.

(Trial Transcript at 1495–99.) Villegas objected to further questions by Berrio's attorney regarding violence and corruption on grounds of relevance, and this line of questioning was soon curtailed.

Garcia contends that the references to violence and the mafia deprived him of a fair trial. We are unpersuaded. The line of questioning was relevant to Berrio's attempt to show intimidation, and it was within the district court's discretion to permit it as having some probative value. We do not view it as unduly prejudicial to the other defendants. The questions and answers did not purport to link Garcia, nor, so far as appears, any other defendant in the case, with the so-called Colombian mafia. There was no suggestion in this testimony that Garcia was an "enforcer" in the Johnnycake farm operation. Further, there was no objection to the questions on the ground now asserted by Garcia on appeal, namely that the prejudicial effect outweighed its probative value. Rather, the objection at trial, by Villegas, was that the testimony would "open[ ] the door" to irrelevant evidence. Nor did Garcia ask for any sort of limiting instruction.

Given the strength of the case against Garcia, who was one of the defendants found in the manufacturing area of the basement, and who does not challenge the sufficiency of the evidence to convict him, and the very short stretch of the now-challenged questioning—seven pages in a four-week trial—we cannot conclude that this testimony negated the fairness of the trial.

## CONCLUSION

We have considered all of defendants' arguments on these appeals and have found them to be without merit. The judgments of conviction are affirmed.