UNITED STATES of America,

v.

Clarence HEATLEY, et al., (John Cuff), Defendant.

No. 96 CR. 515(MBM).

United States District Court,
S.D. New York.

Jan. 22, 1999.

Mary Jo White, United States Attorney, Southern District of New York, Sharon L. McCarthy, Andrew S. Dember, Christine Y. Chi, Assistant U.S. Attorneys, New York, N.Y., for U.S.

Irving Cohen, New York, N.Y., for Defendant Cuff.

Carl J. Herman, Livingston, N.J., for Defendant Cuff.

### OPINION AND ORDER

MUKASEY, District Judge.

This is a supplemental motion by defendant John Cuff to suppress evidence obtained by the government when it opened and copied his non-legal mail while he was detained at the Metropolitan Correctional Center ("MCC"). Judge Sotomayor, to whom this case was previously assigned, denied a prior motion in which Cuff argued that delayed notification to him that his mail had been examined was improper and required suppression of all information seized. However, she permitted Cuff to renew his motion to argue the alleged over-breadth of the warrant, whether authorization to search was properly extended, and related issues. Familiarity with her Opinion and Order, dated September 29, 1998, is assumed for current purposes. In his supplemental motion, Cuff argues both that the warrant was over-broad, authorizing the search of all non-legal mail including such innocuous items as birthday cards to his family and the like, and that the authorization to search was never properly extended beyond the initial seven-day period. For the reasons set forth below, the warrant was not over-broad in the circumstances present here, and although Cuff is correct in arguing that authorization to search was not properly extended, suppression is not warranted in the circumstances present here. Accordingly, the motion is denied.

### I.

#### A. *The Warrant and Subsequent Orders*

On August 12, 1996, Cuff was arrested and detained at the MCC in connection with the charges underlying this indictment, which include narcotics trafficking and numerous murders. Soon afterward, the government learned from a cooperating witness that Cuff had said he could "take care of" a detective involved in the investigation of his criminal activity by "'push[ing] a button.'" (Walsh Aff. ¶ 5) Further investigation, including monitoring of Cuff's non-legal telephone calls, suggested that Cuff was sending letters from jail to help collect debts that arose from narcotics trafficking and to advise certain persons to flee in order to avoid prosecution. (*Id.* ¶ 6) Based on that information, the government on September 19, 1996 sought and obtained from Magistrate Judge Leonard Bernikow a warrant to examine and copy Cuff's non-legal mail, both incoming and outgoing, at the MCC, and either to seize the contents or to return them to their original location—a "sneak and peek" warrant. The warrant was granted pursuant to *United States v. Villegas,* 899 F.2d 1324, 1336–38 (2d Cir.1990), and related cases, and the delay in notice was limited to the maximum reasonable period specified in *Villegas,* seven days. *See id.* at 1337.

The FBI special agent who provided the initial information used to obtain the warrant stated in his affidavit that the government was seeking to examine "incoming

non-legal mail addressed to John Cuff" and outgoing mail "to various individuals including, but not limited to" 11 named persons. (Walsh Aff. ¶ 3) However, both he and the Assistant U.S. Attorney requested authorization to search all outgoing and incoming non-legal mail, without restriction to particular addressees or correspondents. (Walsh Aff. ¶ 7; McCarthy 9/19/96 Aff. ¶ 1) The warrant authorized examination of "incoming and out-going mail of Federal inmate John Cuff" without even specific restriction to non-legal mail. Nonetheless, there is no claim or evidence that Cuff's legal mail was searched, and the warrant appears to have been interpreted as an authorization to search non-legal mail only.

On September 26, 1996, the expiration date for the warrant and the deadline for the notice otherwise required to be given to Cuff that his mail had been intercepted, the government submitted a renewed application to Magistrate Judge Douglas F. Eaton, who was then on duty. That application stated, as did later ones, that the intercepted mail had been screened and searched by an Assistant U.S. Attorney as opposed to an F.B.I. agent or other criminal investigator. (McCarthy 9/26/96 Aff. ¶ 6) Although, as set forth more fully below, the government's renewed application established sufficient cause to continue the authorization to search for at least another week (id. ¶¶ 7–8), the affirmation of the Assistant U.S. Attorney did not state that the government was seeking such extended authorization, and the order she submitted did not provide for it. Rather, the affirmation began by describing the scope of the relief to be requested as follows:

> I submit this Affirmation in support of an application for an Order authorizing, *inter alia,* the continuing non-disclosure of the covert entry, *i.e.,* 'sneak and peek' search, into the incoming and outgoing non-legal mail of federal inmate John Cuff (hereinafter 'mail matter').

(*Id.* ¶ 2) The affirmation ended with the following three-paragraph prayer for relief:

> In view of the ongoing nature of the Government's investigation, and in order to avoid compromising that investigation, I respectfully request that, for an additional period not to exceed seven days from the date of the Order requested herein, the Court continue to dispense with the Government's advance or contemporaneous notice requirement. *United States v. Villegas,* 899 F.2d at 1337–38.
>
> In addition, I respectfully request that this Affirmation, and any Order issued pursuant to this Affirmation, as well as the September 16, 1996 Order and all prior submissions concerning that Order, be sealed for an additional period not to exceed seven days from the date of the Order requested herein and that these documents be kept in the custody of the United States Attorney's Office for the Southern District of New York.
>
> I further respectfully request, upon subsequent application and good cause shown, that the Court permit the Government to extend the period of delay and sealing.

(*Id.* ¶¶ 11–13) The order submitted by the government and signed by the magistrate judge contained the following three decretal paragraphs, granting the relief requested in the Assistant U.S. Attorney's affirmation:

> (1) In order to avoid compromising the Government's ongoing investigation, for a period not to exceed seven days from the issuing date of the Order set forth herein, the Government may continue to dispense with its advance or contemporaneous notice requirement of the sneak and peek search warrant issued on September 19, 1996, which authorized the search of incoming and outgoing non-legal mail of federal inmate John Cuff (hereinafter 'mail matter');
>
> (2) The Affirmation of Sharon L. McCarthy submitted in support of this

Order, and all prior submissions concerning the March 29, 1996 [*sic*] search warrant authorizing the search of the mail matter, are hereby ordered sealed for a period not to exceed seven days from the issuing date of the Order set forth herein, and shall be kept in the custody of the United States Attorney's Office for the Southern District of New York; and

(3) Upon subsequent application and good cause shown, the Court may extend the period of sealing permitted in accordance of [*sic*] this Order.

(9/26/96 Order)

Thereafter, at eight successive one-week intervals, more or less, the government made essentially the same application to each of the magistrate judges who were on duty on those dates: Theodore H. Katz (October 3), Ronald L. Ellis (October 10), Henry Pitman (October 16), Naomi Reice Buchwald (October 24), Michael H. Dolinger (October 31), Sharon E. Grubin (November 6), Andrew J. Peck (November 15), and James C. Francis IV (November 22). In each application, the Assistant U.S. Attorney summarized information obtained by another Assistant U.S. Attorney from Cuff's non-legal mail, including mail from the week before, requested the identical relief that had been granted beginning with the September 26, 1996 order— *i.e.*, extension of the deadline for notifying Cuff that his mail had been intercepted, and notified the magistrate judge reading the application that other magistrate judges had granted such relief earlier, going back to the issuance of the warrant by Magistrate Judge Bernikow on September 19. On no occasion did any of these applications either seek to extend the authorization to search or state that any judicial officer had done so earlier.

B. *Showing of Probable Cause After September 19*

As noted above, the September 26 application presented information gleaned from the first week's mail interception. This included statements of a cooperating witness that had been disclosed by the government to a defendant in an unrelated case, which Cuff apparently had obtained while in jail and sent to his girl friend for transmission to others; Cuff's suggestions that certain confederates try to avoid apprehension both for their own welfare and to avoid further incriminating those already in custody; and Cuff's identification of persons he suspected of cooperating with the government. (McCarthy 9/26/96 Aff. ¶¶ 7–8)

The following week's application, submitted on October 3, 1996 to Magistrate Judge Katz, discussed material that had been described in the earlier application, and disclosed also that in the intervening week Cuff had written a letter discussing the credibility of a potential prosecution witness and had asked one of his addressees to provide advice during a visit. (McCarthy 10/3/96 Aff. ¶¶ 8–10)

The government's application of October 10, 1996, to Magistrate Judge Ellis, summarized certain correspondence that had been described in earlier applications, and stated that during the preceding week Cuff told another correspondent that he had forwarded the witness statement mentioned in the September 26 application; it disclosed as well that an incoming letter to Cuff informed him that one of his confederates had already fled. (McCarthy 10/10/96 Aff. ¶¶ 8–10)

On October 16, 1996 the government submitted an application to Magistrate Judge Pitman. That application reviewed the content of correspondence discussed in earlier applications and stated that during the preceding week Cuff had written to one of his confederates and others about the danger posed by the potential cooperation of his codefendant, Clarence Heatley; had advised that confederate that he would soon provide a new number for contact with Cuff's girl friend; and had urged that confederate to advise others to be wary in

expressing themselves. (McCarthy 10/16/96 Aff. ¶¶ 8–10)

The government submitted another application on October 24, 1996 to Magistrate Judge Buchwald, again reviewing certain correspondence discussed in prior applications and describing also a letter during the preceding week in which Cuff stated that he was being cautious about speaking to people because he believed Heatley was seeking to cooperate. (McCarthy 10/24/96 Aff. ¶¶ 8–9)

The government's next application was submitted to Magistrate Judge Dolinger on October 31, 1996. It too discussed material reviewed in previous submissions, and disclosed that in the week before, Cuff had sent a message through a third party to a codefendant emphasizing that Cuff was not cooperating; Cuff had made the same statement to a relative of that codefendant; and Cuff had written to an acquaintance that he was maintaining his silence. (McCarthy 10/31/96 Aff. ¶¶ 8–11)

On November 6, 1996, the government presented an application to Magistrate Judge Grubin, again describing material disclosed in earlier applications. (McCarthy 11/6/96 Aff. ¶¶ 8–10) That application stated also that in the prior week Cuff had advised one person to flee and told that person that he was not cooperating (*id.* ¶ 11); and that Cuff had emphasized to another person that he was not cooperating and was "'trying to keep people out of here.'" (*Id.* ¶ 12)

The government's next application was submitted on November 15, 1996, to Magistrate Judge Peck. That application as well discussed correspondence that had been disclosed in prior applications. (McCarthy 11/15/96 Aff. ¶¶ 8–11) In addition, it quoted a November 6 letter from Cuff to his girl friend asking her to collect money for him from a person named "Otis." (*Id.* ¶ 12)

The final application in this series was submitted by the government to Magistrate Judge Francis on November 22,

1996. Like its predecessors, it summarized numerous letters Cuff had sent that had been disclosed in earlier applications to other magistrate judges. (McCarthy 11/22/96 Aff. ¶¶ 8–12) In addition, it disclosed a letter Cuff had received that week discussing a newspaper report of a superseding indictment announced earlier in the week and apparently thanking Cuff for not implicating the writer or involving her in criminality: " 'I'm so glad that you didn't expose me or let me in on yours [*sic*] shit! Thank you!' " (*Id.* ¶ 13, quoting Letter of Nov. 18, 1996 from Stefany Cousar to Cuff)

On Monday, December 2, 1996, the government notified Cuff's attorney of the search warrant, and on December 5, 1996 an Assistant U.S. Attorney applied to unseal the warrant and the subsequent applications. That request was made to Magistrate Judge Eaton, to whom the first application for an extension had been made on September 26. In her affirmation in support of the application to unseal, the Assistant U.S. Attorney averred that after Magistrate Judge Bernikow issued the warrant, "the Government applied for and received additional orders to continue to search Cuff's mail and to delay notice; all of those subsequent orders and applications likewise were ordered to be maintained under seal." (McCarthy 12/5/96 Aff. ¶ 2)

## C. *The Parties' Arguments*

Cuff presents an array of arguments for suppression that fit into two general categories. First, he argues that the warrant was facially over-broad, that the court should apply to a sneak and peek warrant of this sort the minimization standards that apply to wiretaps, and that in any event no reasonable law enforcement officer or prosecutor could have relied in good faith on the warrant, even if it were read as restricted to non-legal mail only. Second, he argues that the government never sought or obtained an extension of the authorization to search, so that any evi-

dence seized after the initial one-week period must be suppressed. The government, too, presents an array of arguments, beginning with the bold claim that Cuff had no reasonable expectation of privacy in his non-legal mail and therefore has no Fourth Amendment right to defend here, proceeding to the somewhat more moderate assertion that those who searched Cuff's mail could rely in good faith on their authority to do so based on proceedings before the various magistrate judges, and retreating to the becomingly modest assertion that whatever mistakes were made here do not call for suppression.

## II.

### A. *The Breadth of the Warrant*

■ The government's sweeping assertions to the contrary notwithstanding, Cuff did have an expectation of privacy in his non-legal mail that he may seek to protect here. Although the government is correct that applicable regulations permit prison authorities to inspect and read incoming and outgoing mail, that permission is not boundless. As to incoming non-legal mail, the regulations permit institution staff to read it "as frequently as deemed necessary to maintain security or monitor a particular problem confronting an inmate." 28 C.F.R. § 540.14(a) (1996). As to outgoing mail, the regulation in force at the time of these events permitted such mail to be opened and read by prison staff if there was "reason to believe [the correspondence] ... would facilitate criminal activity." 28 C.F.R. § 540.14(b) (1995). As the Court of Appeals held in *United States v. Cohen*, 796 F.2d 20 (2d Cir.1986), when a prisoner's effects are "searched at the instigation of non-prison officials for non-institutional security related reasons, the validity of the search may be challenged." *Id.* at 24.

Nor does a Bureau of Prisons form signed by Cuff when he entered the MCC on August 13, 1996 change the calculus. That form acknowledged Cuff's awareness that Bureau of Prisons personnel "may open and read my general correspondence if I choose to receive same," (10/14/97 Gov't Br., Ex. 4), but such an acknowledgment by an inmate should be construed in light of applicable law and the necessities that obviously gave rise to the form. The reason for the regulations the government cites is to assure that prison officials have all the authority they need to maintain institutional security for both inmates and staff, and to further the legitimate objectives of the correctional system. *See Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). Whether the issue was made explicit or not, it was that authority that Cuff was being informed of and acknowledging when he signed the Bureau of Prisons form the government proffers here. He was not signing away any remnant of protection the law otherwise might have afforded him. Indeed, the government appears to have recognized that Cuff had some right to the confidentiality of his general, *i.e.*, non-legal, correspondence, when it applied for a warrant before searching that correspondence.

As noted, Cuff attacks the breadth of the warrant, which was read by those who executed it to authorize the examination and copying of all of Cuff's incoming and outgoing non-legal correspondence. Cuff argues that at the least, "[o]nce the government became aware that certain letters did not contain evidence of any criminal activity, they continued to search and seize the contents of those letters, cards and cartoons, taking no steps to curb these limitless and ongoing seizures." (10/15/98 Ltr. Br. at 5). Arguing by analogy to the search in *Villegas* itself, which involved entry onto premises to photograph discrete types of evidence, *see* 899 F.2d at 1335, Cuff argues that the warrant at issue here was facially over-broad because it gave "no assurance that the permitted invasion of a suspect's privacy and property are no more than absolutely necessary." *United States v. George*, 975 F.2d 72, 76

(2d Cir.1992). Further, he maintains that no reasonable investigator could have relied in good faith on so broad a warrant. Therefore, he argues, this case does not come within *United States v. Leon,* 468 U.S. 897, 919–21, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which held that the exclusionary rule does not apply to evidence seized in objectively reasonable reliance on a warrant later declared invalid.

Although misgivings about the breadth of the warrant may be appropriate, I believe, for the reasons set forth below, that the rule of *Leon* does save the evidence seized here. With respect to the breadth of the warrant, the government's initial application for authority to search suggests that perhaps a narrower search would have been appropriate for outgoing mail than for incoming mail. As noted above, the FBI agent's affidavit named 11 persons with whom it was believed Cuff was communicating for illicit purposes, or at least to whom he was making incriminating disclosures. (Walsh Aff. ¶ 3) The warrant might have been limited at the outset to communications either directed to such persons or intended to be conveyed to them indirectly through third parties. As a practical matter, that would have necessitated looking at all letters and other writings initially, but might have permitted some narrowing later, as investigators gained knowledge about who Cuff was communicating with and how. Moreover, the warrant could have directed that only apparently incriminating communications be copied, with other communications simply logged as to date and addressee, and perhaps number of pages, so as to establish which communications had been examined. The problem is somewhat more difficult with respect to incoming mail, which may bear either no identification of the sender or a misleading one. All such mail would have to be opened throughout the period of authorized surveillance and its contents examined. Again, however, I find it hard to rationalize the copying and retention of apparently innocent communications such as greeting cards and other strictly personal and non-incriminating communications.

Cuff has urged me to apply a minimization rule borrowed from Title III wiretap standards set forth in 18 U.S.C. § 2518, which requires a showing that other investigative techniques would not suffice, and that the interception of communications "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). He relies on a line of cases exemplified by *United States v. Biasucci,* 786 F.2d 504 (2d Cir.1986), which applied Title III standards by analogy to video surveillance.

The government opposes the application of Title III minimization standards to the warrant at issue here. The government notes that such standards were created by statute to deal with a search of the sort not imaginable in the eighteenth century when the Fourth Amendment was drafted, *see United States v. Torres,* 751 F.2d 875, 882 (7th Cir.1984) (Posner, J.) (noting that the Fourth Amendment regulates all types of search, not merely "the types of search that were technically feasible in the eighteenth century"), whereas the search effected here is of the more traditional sort. Moreover, the government asserts, it complied with minimization standards by searching only non-legal mail and not actually confiscating any of it, instead making copies and then sending the mail on its way. (*See* Government Memorandum of Law in Opposition to Defendant John Cuff's Supplemental Motion to Suppress at 11 n. 7) It appears to me that the government is correct in arguing that there is no need to import Title III minimization standards by analogy into what is, after all, a conventional rummaging through papers for evidence that is in the mainstream of Fourth Amendment jurisprudence.[1]

---

1. Therefore, there is, thankfully, no need to address the government's jaw-dropping assertion that it was a minimization of intrusion into privacy for the government to have kept

■ The warrant incorporated by reference the affidavit of Agent Walsh, and authorized the seizure of "evidence of ongoing criminal activity in connection with racketeering, extortion[,] narcotics trafficking and murder," presumably as more fully described in that affidavit. In these circumstances, when the only thing being looked at was correspondence, and thus the only things that could be seized were statements contained in that correspondence, the warrant is not impermissibly broad. Further, warrants are read with some tolerance when law enforcement agents have obtained all the information available to them and presented it to a neutral magistrate, as they did here. *See United States v. Young*, 745 F.2d 733, 759 (2d Cir.1984) ("Courts tend to tolerate a greater degree of ambiguity [in the phrasing of a warrant—in *Young*, for the search of a home, and including the catch-all 'other evidence'] where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant."). Thus, although the warrant did not contain any direction to limit the search and seizure beyond possibly confining it to non-legal mail, the person or persons conducting the search were justified in relying on the warrant and I see no basis for suggesting that they did not do so in good faith. This is especially true because, as to mail, there can be no alternative other than to examine everything, at least cursorily, in order to determine what is relevant and what is not.

I make this finding with full awareness that the person screening the mail, and therefore the person conducting the search, was an Assistant U.S. Attorney rather than an investigator. Whatever heightened awareness an Assistant U.S. Attorney may have of applicable standards cannot have been offended by the warrant here, limited as it was necessarily to non-legal mail, all of which had to be examined in order to effect the search. Here, however, I draw a sharp distinction between the execution of the search based on the warrant, and the copying and retention of all mail, relevant and irrelevant, that is distinct from the search, of which there may be more to say.

Although no one has argued the point, much of what was found relevant and shown to successive magistrate judges was not so much evidence of "ongoing criminal activity" in connection with the crimes charged in the indictment, which is what the warrant authorized, as it was evidence of Cuff's involvement in those crimes themselves. However, once government agents had the right to search Cuff's mail, as they did once the warrant was issued, they had the right to seize statements in their plain view if there was *" 'probable cause to associate [them] with criminal activity,' "* Texas v. Brown, 460 U.S. 730, 741–42, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (emphasis in original) (quoting *Payton v. New York*, 445 U.S. 573, 587, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)), as was true of statements betraying Cuff's past involvement in criminal acts but not threatening any ongoing criminality.

a copy of every item of a prisoner's personal and concededly irrelevant correspondence, both incoming and outgoing. In this connection, the government may wish to compare the procedure employed here with the following description of a conventional search contained in Judge Posner's opinion in *Torres:*

> In a conventional search the police go through a home or an office looking for contraband or evidence of a crime, and they either find what they are looking for or not, and then they leave. By rummaging through a person's possessions in search of what they came for they invade the person's privacy, and much of what they examine may be at once personal and irrelevant to the objective of the search, but the search is usually brief.

*Torres,* 751 F.2d at 884. Here, by contrast, because everything was copied, the examination of what is "at once personal and irrelevant to the objective of the search" goes on *ad infinitum.*

The government does not argue explicitly why it was necessary to copy and retain all correspondence, and no justification for doing so leaps out at me from the record. The only information in the government's brief that even implicitly addresses this issue is the citation to cases that have upheld introduction into evidence of recordings by prison officials of prisoner telephone calls. Such calls, even when apparently recorded wholesale without a warrant and given to investigators, have been permitted to be received in evidence over Fourth Amendment objections. *See, e.g., United States v. Workman,* 80 F.3d 688 (2d Cir.1996); *United States v. Willoughby,* 860 F.2d 15 (2d Cir.1988); *United States v. Amen,* 831 F.2d 373 (2d Cir.1987). However, in each case the recordings in question were made at the instance of prison officials pursuant to ongoing telephone monitoring programs and policies that related to maintaining the security and integrity of the prison. *See Workman,* 80 F.3d at 693 (referring to "New York's prison telephone monitoring program"); *Willoughby,* 860 F.2d at 21 ("The telephone interception practices at MCC are among several security procedures ... in effect at that institution."); *Amen,* 831 F.2d at 379 (stating appellants "were on notice of the prison's interception policy"). No case holds that such a practice, or a review of a prisoner's non-legal mail, may be put in place at the instance of government investigators in order to gather evidence and for reasons having nothing to do with prison security.

The arguments of the parties about good faith reliance under *Leon* are somewhat beside the point insofar as the issue of copying all mail, whether or not relevant, is concerned. Nothing in the warrant speaks to what is to be done with irrelevant correspondence after it was reviewed, so it can hardly be said that anyone relied on the warrant in retaining copies of all correspondence. The government argues that sneak and peek warrants are something of a rarity, and that whatever errors occurred here, if any, should be excused on

grounds of novelty. *Cf. United States v. Buck,* 813 F.2d 588, 592–93 (2d Cir.1987) (holding that police officers justifiably relied on a warrant later found over-broad when the requirement of particularity had not yet been spelled out, and concluding that suppression was unwarranted). The question of whether suppression is warranted because of the over-broad copying can be considered together with the same question applied to the lack of authorization.

## B. *Lack of Authorization to Search*

■ As noted, the weekly orders signed by successive magistrate judges to whom application was made after the warrant was initially secured contained no provision extending authority to search. Nor did the affirmations of the Assistant U.S. Attorney disclose that extension of the authority to search was being sought. Rather, by their terms the affirmations sought, and the orders purported to effect, only extensions of the date when the government would be required to disclose to Cuff that his mail had been monitored. The government argues here that sneak and peek warrants, because they are relatively rare, present "unsettled technical and substantive issues" (Gov't Mem. at 14), that none of the magistrate judges who signed the extension orders questioned the government's authority to continue to search (*id.* at 15), and that even Cuff's experienced counsel did not argue initially that the government had failed to obtain extension of the authority to search. (*Id.* at 16) When no one detected the problem, the government argues, the fruits of the search should not be suppressed for failure to include what the government describes, more dismissively than I believe the occasion warrants, as "express boilerplate language." (*Id.* at 23)

The government points also to the fact that it did go regularly before magistrate judges to present evidence, initially the evidence justifying issuance of the warrant

and later evidence gleaned from the search. The government argues as well, and correctly in my view, that whether or not authorization to continue the search was actually obtained, the evidence presented on each application would have supported such authorization.

As to the novelty of sneak and peek warrants, they may indeed present novel issues, but the distinction between authority to search and authority to withhold notice is neither novel nor subtle. Indeed, it was a distinction known to the government at the outset, when it sought first one and then the other, and at the conclusion, when, in the return, it informed Magistrate Judge Eaton explicitly, albeit incorrectly, that it had obtained both.

Nor does it seem to me that there is much that is relevant to the government's own beliefs in the failure of successive magistrate judges to question the ongoing search. None of them was asked to validate an ongoing search, and each extension application was made to a different magistrate judge. None of them had any reason to question whether a prior magistrate judge had extended authority to search or to determine when the authority to search pursuant to the initial warrant expired. Similarly, the initial failure of Cuff's attorneys to notice the problem is hardly surprising. When a warrant was obtained initially, counsel can be excused if they looked only for subtle defects thereafter; looking for what normally may be expected can sometimes result in overlooking what seems too good to be true.

As for the significance of what was omitted, I am not diverted by the government's reference to an extension of the authority to search as "express boilerplate." Since when is it mere "boilerplate" to tell a court what relief the requesting party seeks? How else is a court to know what relief is being sought, so that it can weigh the evidence being submitted to it and determine whether that evidence justifies that relief? Nevertheless, I believe the government is on firm ground when it argues

that ultimately, the lack of authorization to continue the search, if such it was, cannot have operated to Cuff's prejudice because each application contained enough evidence to have justified such continued authorization. I so find.

### C. The Remedy

The remedy Cuff seeks is suppression. The only bases he has for that relief are the over-breadth of the copying and retention and the lack of authorization to search in the extension orders. The over-broad retention of copies occurred after the search had been completed. It seems to me downright perverse to suppress the fruits of the search based on what was done later with the rinds. Moreover, as noted above, the lack of continued authorization to search in each of the extension orders did not prejudice Cuff because each application contained ample evidence of probable cause to support such continued authorization had it been sought.

The Supreme Court has identified four circumstances when an invalid search or seizure does not require exclusion of evidence: (i) when police act in good faith reliance on an apparently legitimate source of authority stemming from a facially valid warrant, *Leon*, 468 U.S. 897, 913, 104 S.Ct. 3405, 82 L.Ed.2d 677, a statute permitting a warrantless search, *see Illinois v. Krull*, 480 U.S. 340, 349–50, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987), or an erroneous police record showing an outstanding arrest warrant, *see Arizona v. Evans*, 514 U.S. 1, 14– 16, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995); (ii) when the connection between the illegal conduct and acquisition of the challenged evidence is so attenuated that it dissipates the taint of the unlawful act, *see Wong Sun v. United States*, 371 U.S. 471, 491, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); (iii) when the evidence was obtained through a source independent of the illegality, *see Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920); and (iv) when the evidence would inevitably have been discovered

through independent, lawful means. *See Nix v. Williams,* 467 U.S. 431, 446–48, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

  This case fits none of those categories precisely, but those categories should not be treated as exhaustive. Rather, the Supreme Court has cautioned in a line of cases beginning with *United States v. Calandra,* 414 U.S. 338, 347–48, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), that the exclusionary rule serves primarily to deter future government misconduct by eliminating the incentive to conduct illegal searches, seizures and arrests. *See, e.g., Evans,* 514 U.S. at 10–11, 115 S.Ct. 1185; *Leon,* 468 U.S. at 906, 104 S.Ct. 3405; *see also United States v. Varela,* 968 F.2d 259, 261 (2d Cir.1992). In determining whether an illegal search or seizure justifies exclusion of evidence, a court is instructed to balance "the deterrence value of a particular application of the exclusionary rule . . . against society's interest in bringing all probative evidence to bear on the questions before the court." *Varela,* 968 F.2d at 261–62 (citing *James v. Illinois,* 493 U.S. 307, 313–19, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990); *United States v. Janis,* 428 U.S. 433, 453–54, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *Tirado v. Commissioner,* 689 F.2d 307, 310 (2d Cir.1982)). For exclusion to prevail in this balance, the deterrent effect must be "substantial and efficient." *Id.* at 262 (internal quotation marks and citation omitted).

  Subjected to such a test, this case is a good candidate for not applying the exclusionary rule. The government appears to have believed that it was complying with the requirements of the Fourth Amendment, and did comply with the important requirement of presenting evidence of probable cause to a neutral magistrate. Suppression would yield little that is useful and would sacrifice the evidence itself. A remedy of sorts is available to cure the excess copying, and it will be applied here: The government is directed

to forward to the court for sealing all correspondence copied other than those letters proffered to the magistrate judges, and to keep no additional copies of any such correspondence. That material will be sealed by the court so that it can be examined, if necessary, in connection with an appeal, or otherwise only on order of the court. Upon Cuff's request, the exhibits attached to his motion which consist of such correspondence will be sealed as well.

Apart from that remedy, moreover, even an opinion denying a motion to suppress can have deterrent effect. No one likes seeing their errors analyzed, whatever the outcome of the motion; few are inclined to repeat errors they have seen analyzed, whether their own or others'.

Mistakes were made, as the morally anemic like to say; but that is all they were—mistakes. The evidence should not be suppressed merely because, in Judge Cardozo's craftily quaint phrase, "the constable has blundered." *People v. Defore,* 242 N.Y. 13, 21, 150 N.E. 585 (1926).[2]

Subject to the sealing order herein described, the motion to suppress is denied.

---

2. For an analysis of that phrase, and the sentence in which it appears, see Richard A.

Posner, *Cardozo—A Study in Reputation* 55–57 (1990).